IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

AYDA NAVARETTE,                                                CV. 05-1827-AS

                 Plaintiff,                              OPINION AND ORDER

     v.

NIKE INC., an Oregon corporation,

                 Defendant.

_____

ASHMANSKAS, Magistrate Judge:

       Presently before the court is the motion for summary judgment filed by defendant Nike, Inc.

("Defendant").  Defendant asserts that plaintiff Ayda Navarrete ("Plaintiff") has failed to present

evidence to support any of her claims and asks the court to dismiss this action in its entirety.  For

the reasons set forth below, the court grants Defendant's motion for summary judgment and

dismisses this case with prejudice.

## Background

       Plaintiff and her husband, Cesar Navarrete ("Cesar"), both of whom are  Hispanic, worked

for Defendant at its Distribution Center in Wilsonville, Oregon (the "Center").   Defendant's

Employee Handbook (the "Handbook") sets forth a description of the company's Zero-Tolerance

Policy for Harassment (the "Policy") which broadly defines harassment and warns employees that

"any violation of this policy will result in immediate corrective action." Rosenbaum Decl., Exh. 1

at 48.  Plaintiff acknowledges that she read, understood and received training on the Policy.

Included in the Handbook was a list of serious infractions that could lead to immediate

suspension or termination.  Three of the listed infractions were: engaging in conduct that is contrary

to Defendant's best interests; assault, battery or any threat of violence; and harassment, intimidation,

threats or discrimination.  Defendant also had a policy that all employees were to speak English

when working on the floor.  The policy did not restrict the employees' use of other languages while

on break or lunch.

In  early July 2004, Plaintiff was told that Adrianna Navarro, a co-worker,[1]  had been

gossiping about Plaintiff — questioning whether Cesar was the father of all three of Plaintiff's

children and stating that Cesar had kissed another woman at the Center.  Plaintiff reported the

conversation to Tammy Robbins, one of Plaintiff's supervisors. Robbins told Plaintiff that she would

take care of the matter and advised Plaintiff "not to talk about this to anybody." Plaintiff's Depo. at

118.

Shortly thereafter, Plaintiff approached Navarro in the restroom to discuss the  things

Navarro had been saying about Plaintiff.   She did not think that this was contrary to Robbins'

direction to not talk about this to anybody because Plaintiff thought that meant anyone else and did

---

[1]A number of the individuals referred to as co-workers in this Opinion were temporary
employees employed by Adecco and assigned to Defendant to work at the Center.

not include Navarro.

Plaintiff emailed Robbins on July 13, 2004, to inform her that she had discussed the situation with Navarro the day before and asked Navarro to stop the gossip/rumors about personal issues but that she was still continuing to hear the gossip. In response to a request from Robbins to identify other folks involved in the situation, Plaintiff named Amalia Bosquez, Isela, Anna and Cesar. Robbins forwarded the email to Kara Johnson, supervisor of the employees involved in the gossip, and asked her to talk to the individuals identified. Johnson talked with all of the individuals and advised them not to get involved in gossip explaining that you never know what is true and you don't want to be spreading false information.

Plaintiff also discussed the matter with another co-worker, Lisa Lopez. Lopez warned Plaintiff that Lorena Lang, who worked in the same department as Cesar, was trying to get into Cesar's pants and that they needed to get Lang "out of here." Plaintiff's Depo. at 143. Plaintiff testified that she indicated that she didn't care about gossip and rumors, she needed to keep her job to support her kids and that she didn't want to make trouble for Lang. Almost immediately after this conversation, Plaintiff saw Lang in the lunchroom. Lang said "Hi" to Plaintiff and Plaintiff asked Lang not to talk to her. Lang then called Plaintiff a "bitch." Plaintiff's Depo. at 160. That was the first mean exchange between Plaintiff and Lang. About this time, Lang complained about Plaintiff to Johnson after being encouraged to do so by two other employees who witnessed Plaintiff try to elbow Lang as she was walking by.

That weekend, Plaintiff called Lang to discuss the rumors and her relationship with Cesar. Allegedly, Lang told Plaintiff that she was really high, that she had had sex with Cesar and that she discussed in sexually explicit detail what she would like to do with Plaintiff. The cell phone

connection was dropped twice during the conversation and Plaintiff called Lang back each time.

When Plaintiff returned to work on Monday, she reported the telephone conversation to Glenn Owen, another one of her supervisors.[2]  However, Owen recalls Plaintiff reporting that Lang initiated the conversation and placed the telephone calls.  Plaintiff indicated that she didn't want to see Lang and asked if she could go home or work in a different department.  Owen denied Plaintiff's request stating that he needed her at her current work station.  Owen also denied Plaintiff's requests to talk to Leanne Harrington, Manager of Human Resources at the Center, and to Johnson, Lang's supervisor.  Owen told Plaintiff that he would handle her complaint and that  they would come to her if they needed more information.

On August 10, 2004, Lang appeared in Johnson's officer visibly upset.  She told Johnson that she had heard that the Navarretes had told Owens that Lang was harassing them, calling their home and claiming to have had an affair with Cesar.  Lang explained that Plaintiff had, in fact, called her five to seven times to question her about her relationship with Cesar.  Lang admitted to having an affair with him and indicated that then Plaintiff called her multiple names and told her she should slit her throat and kill herself.  Lang reported that when she returned to work on Monday, Cesar asked her to lie to Plaintiff, say that she was stoned and that she had made up the whole story.

As a result of Plaintiff's complaints, Lang was terminated from her position at the Center on August 11, 2004.  During the exit interview, Lang reported that Cesar had confronted her that morning, swearing at her, telling her he hated her and threatening to kill her.  He also told her that Plaintiff was going to kick her ass.

_____

[2]Plaintiff alleges that Lang ran into her breasts or buttocks at least ten times at work. However, the record reveals that this is the first time Plaintiff complained about Lang to her supervisor and that she did not reveal this other conduct until after she was terminated.

After Lang was terminated, Plaintiff had no further problems with her co-workers or gossip. However, Defendant initiated an investigation into the conduct of Plaintiff and Cesar with regard to Lang. Harrington and Eric Nelson, the Center's Employee Relations Manager, performed the investigation and interviewed twelve witnesses. Harrington and Nelson concluded that:

> Navarette physically assaulted Lang, used inappropriate language, attempted to intimidate Navarro, threatened Lang, and mislead her managers about the phone calls that took place between herself and Lang, leading to Lang's removal.
> In addition, Navarette was not completely truthful in her investigative interview. She denied incidents confirmed by other witnesses, and was caught in her own deception regarding turning lights on and off on Navarro.

Harrington Decl., Exh. 3 at 3. Harrington and Nelson recommended two disciplinary options for Plaintiff — termination or a final warning.

The investigation report and recommendations were discussed at a meeting attended by Rachel Novotne, Logistics Manager for the Center, Bruce Howard, Novotne's successor as Logistics Manager, Dean Mizer, Howard and Novotne's supervisor, Harrington, Nelson, Beers, Owen and possibly Robbins, on September 16 and 17, 2004. The vote to terminate Plaintiff, and her husband, was unanimous.

In late September 2004, Plaintiff was advised by Corrinna Castillo, a co-worker, that both Plaintiff and her husband would be fired when they returned to work the next day. Plaintiff testified at her deposition that Castillo told Plaintiff that she had overheard an conversation between Matt Seth, a friend and co-worker of the Navarretes, and Brian Beers, Robbins' successor and Plaintiff's new supervisor, in which Beer told Seth that the Navarettes "got fired because they're Mexican, and they weren't going to do nothing about it." Plaintiff's Depo. at 267. However, Plaintiff previously testified at the same deposition that Castillo heard Beers tell Seth the day the Navarette's were fired "Oh, they're Mexican. They're not going to do anything about it." Plaintiff's Depo. at 98. Castillo

stated in her own declaration that she overheard Beers tell Seth that "Cesar and Ayda were going to get fired, and that they would not do anything about it because they were Mexican." Castillo Decl. at 3.

The morning of September 22, 2004, Plaintiff met with Howard, Beers and Nelson and was told she was terminated.  She received a termination letter which indicated that she was terminated due to Violation of Company Rules and Policies, specifically the Zero-Tolerance Harassment and No Violence policies.  Plaintiff immediately filed an appeal complaining that a number of witnesses that she identified were not interviewed during the investigation.  The appeal was denied based, in part, on the fact that the individuals identified by Plaintiff were either related to her or very close friends.  Plaintiff then filed a complaint with the Oregon Bureau of Labor and Industry ("BOLI Complaint") asserting discrimination under state and federal law "based on gender, race, and national origin disparate treatment, hostile work environment, and retaliation."  Rosenbaum Decl., Exh. 1 at 63-4.  The BOLI Complaint was dismissed by letter dated September 6, 2005, and Plaintiff was advised of her right to pursue her claim by filing a civil action within 90 days of the date of the letter.

### Legal Standard

Rule 56 of the Federal Rules of Civil Procedure authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law.  The moving party must show an absence of an issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party shows the absence of an issue of material fact, the non-moving party must go beyond the pleadings and designate specific facts showing a genuine issue for trial.  Id. at 324.  A scintilla of evidence, or evidence that is merely colorable or not

significantly probative, does not present a genuine issue of material fact. United Steelworkers of America v. Phelps Dodge Corp., 865 F.2d 1539, 1542 (9th Cir.), cert. denied, 493 U.S. 809 (1989).

The substantive law governing a claim or defense determines whether a fact is material. T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.1987).  The court must view the inferences drawn from the facts in the light most favorable to the non-moving party. Thus, reasonable doubts about the existence of a factual issue should be resolved against the moving party. Id. at 630-31.  The Ninth Circuit, however, has stated, "[n]o longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment." California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics Inc., 818 F.2d 1466, 1468 (9th Cir. 1987), cert. denied, 484 U.S. 1006 (1988).  When the non-moving party's claims are factually implausible, that party must come forward with more persuasive evidence than would otherwise be required. Id.

Special rules of construction apply to evaluating summary judgment motions: the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. Lytle v. Household Mfg., Inc., 494 U.S. 545, 554-55 (1990). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000).

The Ninth Circuit has reiterated that a high standard exists for granting of summary judgment in employment discrimination cases. Schnidrig v. Columbia Machine, Inc., 80 F.3d 1406, 1410 (9th Cir. 1996) (holding that courts should require very little evidence to survive summary judgment in a discrimination case, because the ultimate question is one that can be resolved only through a searching inquiry--one that is most appropriately conducted by the fact-finder, upon a full record)

(citations omitted); see also Lam v. University of Hawaii, 40 F.3d 1551, 1563 (9th Cir. 1994)

(quoting Sischo-Nownejad v. Merced Community College Dist., 934 F.2d 1104, 1111 (9th Cir.

1991)).

Discussion

Plaintiff claims that Defendant discriminated against her based on her race, color, national

origin, gender, sex and marital status by terminating her, subjecting her to a hostile environment and

by retaliating against her when she complained about the discriminatory practices. Plaintiff alleges

that this conduct violated both federal and state statutes. Plaintiff also asserts a claim for intentional

infliction of emotional distress ("IIED").[3]

**Race, Color and National Origin Claims**

Plaintiff asserts her claims for race, color and national origin discrimination under 42 U.S.C.

§1981, 42 U.S.C. §2000(e) and O.R.S. 659A.030(1)(a), (b) and (f). "[A] plaintiff may establish a

*prima facie* case of intentional discrimination in employment under section 1981 upon proof of facts

which would establish a *prima facie* case of disparate treatment under Title VII, pursuant to the four

McDonnell Douglas elements or otherwise." Gay v. Waiters' & Dairy Lunchmen's Union Local No.

30, 694 F.2d 531, 539 (9th Cir. 1982). Further, the standard for establishing a *prima facie* case of

discrimination under ORS 659.030 is identical to that used to establish a *prima facie* case of

discrimination under Title VII. Henderson v. Jantzen, Inc., 79 Or.App. 654, 658 (1986). Therefore,

this court will analyze all three discrimination claims simultaneously.

---

[3]Plaintiff's claims for wrongful discharge and reckless infliction of emotional distress
were dismissed by this court on January 26, 2007.

An employee can prove an employer's unlawful discrimination under Title VII based on either of two theories.  A disparate impact theory involves a "facially neutral employment criterion that has an unequal effect on members of a protected class." Sischo-Nownejad v. Merced Community College Dist., 934 F.2d 1104, 1109 (9th Cir. 1991).  A disparate treatment theory, on the other hand, involves intentional discrimination on the basis of race, color, religion, sex, or national origin. International Bhd. of Teamsters v. United States, 431 US 324, 335 n.15 (1977); Sischo-Nownejad, 934 F.2d at 1109.  "Proof of discriminatory motive is critical" to a claim of disparate treatment. Teamsters, 341 U.S. at 335 n.15.

Plaintiff's *prima facie* case of unlawful employment discrimination on the basis of her race may be established by either direct or circumstantial evidence.  "Direct evidence is defined as 'evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude.'" Enlow v. Salem-Keizer Yellow Cab Co., Inc., 389 F.3d 802, 812 (9th Cir. 2004)(quoting Walton v. McDonnell Douglas Corp., 167 F.3d 423, 426 (8th Cir. 1999).  Or, stated more succinctly, "direct evidence is evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption." Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1220 (9th Cir. 1998)(citing Davis v. Chevron, 14 F.3d 1082, 1085 (5th Cir. 1994)).  Not every comment about a worker's race is direct evidence of a discriminatory motive.  "The Ninth Circuit has held a 'stray remark' that is 'uttered in an ambivalent manner and [is] not tied directly to [the plaintiff]'s termination is insufficient to create an inference of discriminatory motive.'" Hartung v. Cae Newnes, Inc., 229 F.Supp.2d 1093, 1100 (D.Or. 2002)(quoting Merrick v. Farmers Inc. Group, 892 F.2d 1434, 1438-39 (9th Cir 1990).  In the absence of direct evidence, unlawful discrimination is presumed if plaintiff can show that: (1) she belongs to a protected class;

(2) she was performing according to her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) other employees with qualifications similar to hers were treated more favorably.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).[4]

Plaintiff relies on  Beers' statement to Seth that she and her husband were fired because they were Mexicans as direct evidence of discrimination.[5]  If Beers, in fact, made this statement, Plaintiff may well have presented a *prima facie* case of race-based discrimination.  However, the record does not support this version of the conversation between Beers and Seth.  Plaintiff clearly stated in her deposition that Beers stated that he did not think that Plaintiff would do anything if she was terminated because she was Mexican.  She then later changed her the statement to convey the idea that she was terminated because she was Mexican.  Plaintiff cannot raise a genuine issue of fact by contradicting herself.  Additionally, Castillo, who actually overheard the statement, stated that Beers

---

[4]Plaintiff cites to Kortan v. California Youth Authority, 217 F.3d 1104 (9th Cir. 2000), in support of her argument that an employee establishes a *prima facie* case of employee discrimination by proving that she is a member of a protected class, she was performing her job satisfactorily, and that she either suffered an adverse employment action or was treated differently from others similarly situated.  If this were, in fact, the appropriate standard, any protected person that was doing a good job would be protected from any kind of adverse employment action regardless of whether the adverse employment action had any relationship to their protected status.  The court does not believe this is the appropriate standard.

[5]Plaintiff also refers to racial comments made by Seth (referring to Cesar as a "stupid Mexican," asking Plaintiff if she had any female relatives because he needed a "good Mexican woman that could cook" and complaining about listening to the "Mexican crap" at work), Owen (requesting that Adecco not bring in more Spanish speaking workers as there were already too many at the Center) and Robbins (Robbins told Cesar that he couldn't understand the monthly shoe giveaway because he was Mexican and could not speak or understand English very well).  The comments made by Seth are not relevant as he was a co-worker, not a supervisor or manager, and did not have any input into Plaintiff's termination.  Owen and Robbins comments were stray comments that did not exhibit racial animus and were not tied to Plaintiff's termination.  While Owen and possibly Robbins were at the meeting at which Plaintiff's termination was discussed, there is no evidence that they aggressively supported the termination.

told Seth that the Navarettes "were going to get fired, and that they would not do anything about it because they were Mexican." Castillo Decl. at 3. Based on Castillo's version of the events, there is no direct evidence of discriminatory intent. Beers merely stated that he didn't think the Navarettes would appeal or contest the termination because they were Mexican, not that they were terminated because they were Mexican.

Additionally, while Beers attended the meeting where the Navarettes' termination was discussed, he was not the individual who recommended termination or supported it. He had only supervised Plaintiff for a brief period of time and, though he agreed with the decision to terminate Plaintiff, he was one of about eight who voted in favor of termination and cannot be viewed as the decision maker in this context.

The fact that Harrington and Nelson did not interview the witnesses suggested by Plaintiff during the investigation is not direct evidence of Defendant's discriminatory motives. Harrington and Nelson interviewed twelve individuals who either saw or were otherwise aware of Plaintiff's treatment of Lang. There is no evidence that Plaintiff identified the individuals during the course of the investigation — it appears that she provided them to Daugherty at the time she appealed her termination. Also, Defendant indicated that the individuals identified by Plaintiff were either related to or close personal friends of Plaintiff's and would not be as credible as those interviewed during the investigation.

Plaintiff also offers circumstantial evidence in support of her discrimination claim. Specifically, Plaintiff offers the fact that Seth, a Caucasian, was involved in the conflict with the Navarettes and Lang but was not terminated and that Defendant refused to interview witnesses identified by Plaintiff. Under the McDonnell Douglas test, it is clear that Plaintiff is a member of

Page -11- OPINION AND ORDER                                                        {SIB}

a protected class (Mexican) and that she suffered an adverse employment action (termination). There is no evidence that she wasn't performing her job satisfactorily. The sole remaining factor is whether other similarly situated employees who were not a member of a protected class were treated differently. The fact that Seth had a relationship with the Navarettes and Lang and that he was present during some of the alleged offensive conduct but was not fired is not evidence that he was treated differently because of his race. The only evidence in the record that Seth harassed a co-employee was when he threatened to have Lang removed from her assignment with Defendant if she didn't continue her relationship with him. This conduct was unrelated to the behavior which resulted in Plaintiff's termination, was an isolated instance which was immediately resolved to the parties' satisfaction and was not nearly as offensive as Plaintiff's conduct.

Plaintiff also asserts that Defendant retaliated against her for complaining about racial discrimination in the workplace. To make out a *prima facie* case of retaliation, Plaintiff must establish that: (1) she engaged in protected activity, such as filing of a complaint alleging racial discrimination, (2) the employer subjected her to adverse employment actions, and (3) a casual link exists between the protected activity and the adverse action. Manatt v. Bank of America, NA, 339 F.3d 792, 798 (9th Cir. 2003). Plaintiff's retaliation claim based on race fails because there is no evidence that she reported racial discrimination to Defendant at any time prior to her termination. In fact, Plaintiff admits that the first time she complained of discrimination based on her race was when she filed her BOLI complaint. Plaintiff's Depo. at 272.

Finally, Plaintiff asserts that Defendant created a hostile work environment by requiring all employees to speak English when working on the floor. To establish a *prima facie* hostile work environment claim, an employee must show that: (1) she was subjected to verbal or physical conduct

because of her race; (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter conditions of her employment and create an abusive work environment. Gregory v. Widnall, 153 F.3d 1071, 1074 (9th Cir. 1998). To survive summary judgment, a plaintiff must establish a genuine issue of material fact on whether her workplace was both objectively and subjectively racially hostile, *i.e.,* one that a reasonable person would find hostile or abusive and one that the victim, in fact, perceived it to be and whether the employer failed to take adequate remedial and disciplinary action. Steiner v. Showboat Operating Co., 25 F.3d 1459, 1462-1463 (9th Cir. 1994); see also Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998). Courts should consider the frequency of the discriminatory conduct, its severity, whether it [was] physically threatening or humiliating, and whether it unreasonably interfere[d] with an employee's work performance. Harris v. Forklift Systems, 510 U.S. 17, 23 (1993).

Here, the court questions whether Defendant's requirement that all employees use English when on the floor was offensive to Plaintiff, who testified that English is her first language. Plaintiff's Depo. at 7. Even assuming that Plaintiff was offended by this policy, the Ninth Circuit has held English-only policies similar to that used by Defendant were not discriminatory and did not violate Title VII with regard to bilingual employees. Garcia v. Spun Steak Co., 998 F.2d 1480, 1489 (1993).

Plaintiff has failed to present the evidence necessary to support her claims of discrimination, hostile environment and retaliation based on her race, color or national origin. Accordingly, Defendant is entitled to summary judgment on these claims.

**Gender/Sex Claims[6]**

Plaintiff claims that Defendant discriminated against her based on her sex by not listening to what she had to say about Lang. She felt that Defendant didn't believe her complaints because she was a girl and that she was ultimately terminated for this same reason. The evidence paints a different picture.

Lang was terminated as a result of Plaintiff's complaints. Clearly, Defendant listened to what Plaintiff said in this instance and believed her enough to terminate an employee. Also, the investigation against Plaintiff was initiated in response to Lang's complaints about Plaintiff and her husband. Again, Defendant listened to, believed and reacted to complaints made by Lang, a woman. Finally, Cesar's complaints about Lang's conduct were substantially similar to those made by Plaintiff and Cesar was terminated as well. Plaintiff has failed to present any evidence that she was terminated as a result of her sex or gender.

Plaintiff's retaliation claim is supported by the fact that she complained to Owen about Lang's sexually-explicit comments to her during the telephone conversation. However, this conduct occurred on the weekend, not during work hours or at the Center and, therefore, can not be considered to be employment-related. Additionally, Defendant reacted appropriately to Plaintiff's complaints by terminating Lang shortly after the complaints were made and did not take any action against Plaintiff until after Lang's exit interview, in which she advised Defendant that Plaintiff had engaged in harassing behavior. If Plaintiff's termination was related in any way to her reporting of

---

[6]The standards set forth above for Plaintiff's discrimination, retaliation and hostile environment claims based on race apply to Plaintiff's claims based on her gender, sex and marital status as well and will not be restated.

the sexual harassment, it is because Harrington and Nelson determined that Plaintiff "mislead her managers about the phone calls that took place between herself and Lang, leading to Lang's removal" not because she made the complaint.  Harrington Decl., Exh. 3 at 3.

As noted above, the sexual harassment that Plaintiff complained of occurred over the weekend, not at the Center during work hours.  Other than not wanting to work with Lang the following week, this conduct did not affect Plaintiff's work environment.  Also, Defendant reacted in a prompt and appropriate manner to Plaintiff's complaint by terminating Lang shortly after her behavior was reported.  The evidence in the record does not support Plaintiff's sex or gender-based discrimination, retaliation and hostile environment claims.

**Marital Status Discrimination**

The remaining discrimination, retaliation and hostile environment claims are  based on Plaintiff's marriage to Cesar.  She alleges that she was terminated because of her marital status. Oregon law prohibits employers from discriminating against employees based on their marital status. O.R.S. 659A.030.  An employee may enforce their rights under the statute by filing a complaint with Oregon's Bureau of Labor and Industries (the "Bureau") no later than one year after the alleged unlawful practice.  O.R.S. 659.820(1).  If the Bureau elects not to investigate the allegations complained in the complaint, the employee may file an action in court within 90 days after notice of the Bureau's decision is mailed to the employee. O.R.S. 659A.880.  Or, an employee may bypass the Bureau and file an action in court within one year after the occurrence of the unlawful employment practice. O.R.S. 659.875(1).

Plaintiff was terminated on September 22, 2004, and she filed this action on December 5, 2005.  Plaintiff's marital status discrimination claims are time-barred unless she included the claim

Page -15- OPINION AND ORDER                                                                    *{SIB}*

in her BOLI Complaint. Any claim that falls within the scope of the Bureau's investigation or an

investigation that could reasonably be expected to stem from a claim is considered to be adequately

alleged in a charge filed with the Bureau. B.K.B. v. Maui Police Dep't, 276 F.3d 1091, 1100 (9th Cir.

2002). In determining whether a current claim is reasonably related to the charges in the BOLI

complaint, the court considers the following: (1) the alleged basis of the discrimination; (2) the dates

the alleged discriminatory acts occurred; (3) the alleged perpetrators of discrimination; and (4) the

locations at which the alleged discrimination occurred. Id. at 1099.

Plaintiff specifically alleged gender, race, national origin and sex discrimination in her BOLI

complaint. She makes no reference to a marital status claim. She does refer to her husband in the

claim. Clearly, the dates of the conduct relating to the race and sex discrimination are the same as

that supporting the marital status claim, as well as the perpetrators and the locations. Based on the

common nucleus of facts supporting all of Plaintiff's discrimination claims, the court finds that the

marital status claim was reasonably related to the charges asserted in the BOLI Complaint.

Additionally, Plaintiff specifically references O.R.S. 659A.030, which includes marital status as a

protected class under Oregon's employment discrimination scheme. In light of the common nucleus

of facts and the reference to the relevant statute, the court is not convinced that Plaintiff's marital

status claim was not legally asserted in the BOLI Complaint.

Considering the merits of Plaintiff's marital status claim results in the same conclusion as

Plaintiff's other discrimination claims. The evidence before the court does not adequately support

Plaintiff's claim that she was discriminated against because she was married to Cesar. Plaintiff has

no direct evidence that she was terminated because she was married to Cesar. Lang, the only other

similarly situated employee who was not married, was also terminated which defeats Plaintiff's

claim that married employees were treated worse that single employees. Based on these facts, Plaintiff is unable to support her claim for marital status discrimination.

Plaintiff did not specifically complain about marital status discrimination until she filed this action, well after she was terminated. Accordingly, it is clear that Plaintiff was not terminated because she engaged in a protected activity with regard to her marital status.

Finally, even if Lang's actions could be deemed harassment based on the fact that Plaintiff was married to Cesar, such harassment would be related to Plaintiff's relationship to Cesar, not the fact that she was married to him. In other words, Lang's actions would have been the same if Plaintiff were Cesar's live-in girlfriend and not his wife. Where the harassment is based on the relationship and not the marital status, a claim for marital status discrimination does not exist. See, Chen v. County of Orange, 96 Cal.App.4th 926 (2002). The court also notes that Lang was terminated shortly after Plaintiff complained about the harassment, which further weakens Plaintiff's already weak claim for hostile work environment based on marital status.

**Intentional Infliction of Emotional Distress**

Plaintiff alleges that Defendant knew that the conduct surrounding her termination would cause severe mental or emotional distress and that it acted with the intent of causing her to suffer such distress. "To succeed on her claim for intentional infliction of emotional distress, Plaintiff must show that: (1) Defendant intended to inflict severe emotional distress on Plaintiff; (2) Defendant's acts did in fact cause Plaintiff to suffer severe emotional distress; and (3) Defendant's acts consisted of 'some extraordinary transgression of the bounds of socially tolerable conduct.' Lewis v. Oregon Beauty Supply Co., 302 Or. 616, 626 (1987)(citation omitted).

Regarding the intent requirement for an IIED claim, the Oregon Supreme Court has stated that while there is no "purpose" requirement, there must be evidence that the person acted out of a desire to inflict emotional distress. McGanty v. Staudenraus, 321 Or. 532, 550 (1995). Adopting the Restatement of Torts definition, the Court explained: "The word 'intent' is used throughout the Restatement of [Torts] to denote that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it." Id.

With regard to the question of whether conduct rises to the level of "an extraordinary transgression of the bounds of socially tolerable conduct," the Oregon Supreme Court has held that conduct that is merely "rude, boorish, tyrannical, churlish and mean" does not satisfy the high standard that defendant's acts must constitute an extraordinary transgression of the bounds of socially tolerable conduct. Patton v. J.C. Penney Co., 301 Or. 117, 124 (1986), abrogated on other grounds by McGanty, 321 Or. 532. The court has stated that IIED "does not provide recovery for the kind of temporary annoyance or injured feelings that can result from friction and rudeness among people in day-to-day life even when the intentional conduct causing plaintiff's distress otherwise qualifies for liability." Hall v. The May Dep't Stores Co., 292 Or. 131, 135 (1981), abrogated on other grounds by McGanty, 321 Or. 532. "A discharge from employment, without more, d[oes] not amount to an extraordinary transgression of the bounds of socially tolerable conduct." McGanty, 321 Or. at 549.

While IIED claims are common in the context of employment disputes, Oregon appellate courts have been very hesitant to impose liability for IIED claims in employment settings, even in the face of serious employer misconduct. Madani v. Kendall Ford Co., 312 Or. 198, 205-06 (1991), abrogated on other grounds by McGanty, 321 Or. 532; Lewis, 302 Or. 616. The Oregon appellate

court has stated that socially intolerable conduct is that which is "outrageous in the extreme." See

Watte v. Edgar Maeyens, 112 Or.App. 234, 239 (1992).

The court agrees that the language allegedly used by Lang in her telephone conference with

Plaintiff was vulgar and offensive.  But, this conduct occurred between two employees away from

work and outside of work hours.  Defendant is not responsible for Lang's conduct when she is not

on the job and under Defendant's control.

Viewing the actions of Defendant's managers and supervisors, the court finds no conduct that

was outrageous in the extreme.  Plaintiff's supervisors responded promptly and appropriately to her

complaints, she was interviewed and allowed to give her input during the investigation and she was

terminated in a private meeting attended by herself and three managers, where they advised her she

had been terminated and read her the termination letter.  All of this conduct is absolutely reasonable

under the circumstances and does not support Plaintiff's claim for intentional infliction of emotional

distress.

### Conclusion

Defendant's motion for summary judgment is GRANTED.

DATED this 28th day of September, 2007.

> /s/   Donald C. Ashmanskas
> DONALD C. ASHMANSKAS
> United States Magistrate Judge